UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| TAMMY LYNN BROWN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:07CV1993 AGF |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This action is before this Court[1] for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff Tammy Lynn Brown was not disabled and, thus, not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. For the reasons set forth below, the decision of the Commissioner shall be affirmed.

Plaintiff, who was born on September 24, 1976, filed an application for disability insurance benefits and supplemental social security income on October 26, 2004, at the age of 28, claiming a disability onset date of April 18, 2004, as a result of asthma, hearing loss and an inability to read and write. After Plaintiff's application was denied at the initial administrative level, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") and such a hearing was held on December 19, 2006. By decision dated

---

[1] The parties have consented to the exercise of authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

February 22, 2007, the ALJ found that the Plaintiff could return to her previous work as a shipping and receiving worker and was thus, not disabled. Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on September 27, 2007. Plaintiff has therefore exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that in assessing her mental residual functional capacity ("RFC"), the ALJ erred in adopting the vocational opinion of a non-examining medical consultant (Judith A. McGee, Ph.D.) with regard to what work Plaintiff could perform, in giving more weight to that consultant's summary conclusion than to her more specific activity-based evaluation, and in misinterpreting the consultant's overall evaluation. Plaintiff further argues that the ALJ failed adequately to determine the demands of Plaintiff's past relevant work before comparing it to her RFC. Plaintiff requests that the ALJ's decision be reversed and that the case be remanded for an award of benefits or, alternatively, for a new hearing.

**Work Record and Application Forms**

In her application forms, Plaintiff reported that she last worked on April 14, 2004, and stopped working because she was laid off. She had held this job in shipping and receiving at a K-Mart store from May, 1999 to April 14, 2004. Her duties included taking clothes out of boxes and hanging the clothes up, and stocking merchandise, including large items such as furniture. She reported that before she was laid off, her employer began to train her "on damage and control." The job did not require any

2

writing or completion of reports, she did not supervise other people, and she was not a lead worker. Id. at 230-31.[2] The record indicates that in 1999, Plaintiff earned approximately $10,000, and from 2000 through 2003, earned between approximately $12,000 and $14,000 per year. Her last reported earnings were approximately $4,000 in 2004. Id. at 112.

Plaintiff's cousin, Florence Stout, completed a third-party Function Report on August 29, 2005. Ms. Stout noted that Plaintiff handled many household chores satisfactorily, but that she was unable to understand bank accounts and bill-paying, and could not read very well. Ms. Stout indicated that Plaintiff became upset easily when she did not understand something, and therefore, did not sustain her attention to tasks that caused frustration. Ms. Stout also wrote that Plaintiff would cry and get upset when authority figures were loud or rude to her, would "fold under stress," and did not deal well with change. Id. at 171-79.

**School and Medical Records**

Plaintiff's school records indicate that in 1988 she was diagnosed as mildly mentally retarded with IQ scores of 54 verbal, 70 performance, and 59 full-scale. In 1994, when she was in ninth grade, she carried a diagnosis of mentally handicapped and received instruction from a special education teacher for core subjects, as well as

---

[2] In another Work Activity Report, Plaintiff indicated that she held this job from August 1, 2000 to April 1, 2004, and that she believed she was laid off because she could not read or write. (Tr. at 204.)

supervision in her regular education classes as needed or requested. Her Individualized Education Program report dated March 25, 1994, noted that she processed information best when it was presented to her individually. Difficulty in following multiple-level directions and social difficulties were noted. Special education services were changed from a self-contained classroom to resource help. Id. at 143-62.

On September 30, 2005, state consulting psychologist, L. Lynn Mades, Ph.D., conducted a psychological examination and evaluation of Plaintiff in connection with Plaintiff's application for disability benefits. Plaintiff reported that she had trouble reading and writing, and had a history of special education placement. Plaintiff also reported that she had been hit by a pickup truck at the age of nine and was in the hospital for several months thereafter. Dr. Mades reported that Plaintiff's expression was alert and eye contact was good. She was spontaneous, coherent, relevant, and logical.

Dr. Mades administered the Wechsler Adult Intelligence Scale - Third Edition (WAIS-III), upon which Plaintiff obtained scores of verbal IQ 69, performance IQ 75, and full scale IQ 69. Dr. Mades opined that Plaintiff's persistence with tasks on the test was good and that her frustration tolerance appeared fair to good. Plaintiff was pleasant, cooperative, and motivated, and Dr. Mades concluded that the results of the test were a valid estimate of Plaintiff's current level of functioning, with the performance IQ being the best representative of her potential. Dr. Mades diagnosed a learning disorder NOS

(not otherwise specified), borderline intellectual functioning, and a GAF score of 70.[3]  Id. at 251-55.

Also on September 30, 2005, Plaintiff underwent a physical examination by Elbert Cason, M.D., who found that Plaintiff had a slight hearing loss of both ears (able to hear conversational speech readily), a history of some asthma controlled with over-the-counter medication, and was slightly overweight.  Id. at 246-48.

On October 21, 2005, Judith McGee, Ph.D., a non-examining state psychological consultant, completed a Psychiatric Review Technique form on which she indicated that Plaintiff suffered from an organic mental disorder that did not meet the requirements of a deemed-disabling impairment listed in the Commissioner's regulations.  In a Mental RFC Assessment, Dr. McGee opined in checkbox format that Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions; and markedly limited in her ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, and work in coordination with or proximity to others without being

---

[3]  A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations.  Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32.  GAF scores of 31-40 indicate "[s]ome impairment in reality testing or communication or "major" impairment in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild"" impairment.

distracted by them. On the same form, Dr. McGee indicated that Plaintiff was not significantly limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, to respond appropriately to changes in the workplace, and to set realistic goals and make plans independently of others. Referring to her Psychiatric Review Technique Form, Dr. McGee wrote that Plaintiff retained the ability for simple work with verbal instructions; was able to maintain concentration, persistence, and pace; was able to make simple decisions; and had intact social functioning. Id. at 183-85.

On September 22, 2006, an individual named Bridget Fogarty completed a Mental Medical Source Statement regarding Plaintiff's abilities to perform work-related activities. Ms. Fogarty indicated in checkbox format that Plaintiff has a moderate limitation (defined on the form as a "significant functional limitation that is more than minimal") in all areas of activities of daily living, in social functioning, and in concentration, persistence, or pace. She also indicated that Plaintiff had had one or two episodes of decompensation and that Plaintiff's limitations could be expected to last at the severity level assessed. Id. at 241-43.

According to a November 1, 2006 Support Plan from the St. Louis Regional Center of the Missouri Division of Mental Retardation and Developmental Disabilities ("Regional Center"), Plaintiff reported that she had not worked in a year and could not find a job, but that she helped her aunt with babysitting. It was noted that Plaintiff was functionally illiterate. She wanted to learn to read and write, for which she thought she

6

needed one-on-one help, and to get her GED so that she could be independent, but she reported being unable to understand her financial and legal issues without help. It was noted that Plaintiff obtained a driver's license in September 2004, although she did not have a vehicle and relied on her mother for transportation. Regional Center planned to help Plaintiff learn to attend community social events without assistance from her family. Id. at 127-32.

The record contains undated "case action notes" of John Raabe, M.D., who wrote that Plaintiff's physical allegations of asthma and hearing loss were less than fully credible and that her physical impairment was non-severe. Id. at 201.

**Evidentiary Hearing of December 19, 2006**

Plaintiff, who was represented by counsel, testified that she was 30 years old and had lived with her mother her entire life. She had never been married and did not have any children. She did not know how tall she was, nor did she recall the last grade level she completed in school, though she remembered that she received special education help while at school. Plaintiff said that she was currently getting help from Regional Center but did not know how long she had been going there, her counselor's name, or how often she went. The only past work Plaintiff remembered was unloading trucks and hanging clothing at K-Mart, but she did not remember how long she kept that job. Plaintiff testified that she worked five days a week at K-mart, and that a manager had to show her what to do on a daily basis. Id. at 23-24.

Plaintiff testified that she did not know what caused her memory problems, and

7

that she relied on her mother's help in performing everyday tasks, including housework. Plaintiff said that she had difficulty cooking because she had trouble remembering directions. She stated that she was able to drive a car, and that her father helped her take her driver's test. However, someone usually drove with her due to her inability to read signs and remember streets. Id. at 24-26.

Plaintiff stated that she could not read or write, although she could write her name. She said that when she had to go somewhere, her mother, her cousin, or a friend went with her. She could not remember the last time she went somewhere alone. When asked whether there was a reason she did not go places by herself, Plaintiff testified that it was because she would get lost. She stated that the last time she got lost was about a month ago. Id. at 26-27.

Plaintiff testified that she had arthritis in her legs, experiencing pain when she got up and when she walked for long periods of time. She had not seen a doctor about this but took over-the-counter medication. She could not walk for very long without her legs hurting and she had been dealing with this condition for a long time. When asked what caused the pain, Plaintiff said it was the result of an accident that Plaintiff's mother told her had occurred when Plaintiff was eight years old. Plaintiff said that she was told that the accident also caused "blood on [her] brain." Id. at 27-28.

Plaintiff testified that she had trouble breathing and when she walked up or down stairs, she often lost her breath and needed to sit. Her mother bought her over-the-counter inhalers, which she used four times a day. Plaintiff testified that she had

8

difficulty sleeping at night, and that slight noises woke her up. She only went to the grocery store with her mother because she was unable to find her way around the store and got confused about prices. Plaintiff said that she went out with friends, though she did not know how often. She testified that she did not use alcohol, drugs, or cigarettes. Id. at 28-30.

When asked by the ALJ why her last job ended, Plaintiff said that they told her they were going out of business. She stated that she received unemployment compensation as a result, but did not remember for how long. Plaintiff testified that while at that job, the heaviest thing she had to lift was furniture, though she did not know how much the furniture weighed. She said that she was on her feet the entire time she was working. The ALJ asked Plaintiff if she knew who Bridget Fogarty was and Plaintiff responded in the negative. Plaintiff said that she cleaned around the house with the help of her mother. She denied doing any babysitting or odd jobs for anyone, and said that her case worker told her there were no GED classes for her to take. At the close of the hearing, Plaintiff's counsel asked the ALJ to consider sending Plaintiff for an additional full consultative evaluation due to her brain injury and the extent of her memory loss. The ALJ said that he would take the matter under advisement. Id. at 30-32. No such examination was ordered.

**ALJ's Decision of February 22, 2007**

The ALJ determined that Plaintiff's borderline intellectual functioning and learning disorder were "severe" as that term is defined in the Commissioner's regulations.

9

The ALJ concluded, however, that these impairments did not meet or medically equal the criteria for any deemed-disabling impairment listed in the regulations. The ALJ summarized Plaintiff's testimony and the "scant medical evidence submitted for review." The ALJ gave no weight to Ms. Fogarty's September 22, 2006 report because there was no indication that she treated, counseled, or met Plaintiff. The ALJ characterized Dr. Cason's September 2005 physical examination of Plaintiff as "completely unremarkable" other than noting that Plaintiff was overweight. The ALJ described Dr. Mades's September 2005 mental examination of Plaintiff in detail. He noted Dr. Mades's conclusion that Plaintiff's WAIS-III scores placed her in the mildly mentally retarded to borderline range of intellectual functioning, that Plaintiff's performance IQ of 75 was the best representative of Plaintiff's cognitive potential, and that Plaintiff's GAF score was 70. Id. at 14-15.

The ALJ stated that he evaluated the credibility of Plaintiff's allegations under the standard set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984). The ALJ did not find credible Plaintiff's contention that she was unable to engage in any substantial activity due to her impairments. He noted that no physician has stated that Plaintiff was disabled or that she could not work. Moreover, medical consultants determined that Plaintiff had the physical capabilities to perform work at any exertional level. Id. at 16.

The ALJ opined that the fact that Plaintiff collected unemployment benefits after her last job ended showed that she was capable of working. The ALJ also relied on the fact that Plaintiff's last job did not end due to any impairment-related condition, and that

she would still be working at that job if the K-Mart store had not shut down. The ALJ determined that Plaintiff had the RFC to perform a wide range of work at any exertional level with limitation to simple work with verbal directions. He found that Plaintiff's past relevant work as a shipping and receiving worker did not require the performance of work-related activities precluded by her RFC. The ALJ reviewed the requirements of that job as described by Plaintiff, noting its physical demands and the fact that she completed no reports and did not supervise anyone. The ALJ concluded that Plaintiff's impairments did not prevent her from performing her past relevant work and that she was, thus, not disabled. Id. at 17-18.

## DISCUSSION

**Standard of Review and Statutory Framework**

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)). Reversal is not warranted, however, "'merely because substantial evidence would have

supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (citation omitted)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Work which exists in the national economy "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." Id. § 423 (d)(2)(A). Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied. If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's

impairment meets or is equal to one of the impairments listed in Appendix I. If the claimant's impairment is equivalent to a listed impairment, the claimant is conclusively presumed to be disabled. Otherwise, the Commissioner asks at step four whether the claimant has the RFC to perform her past relevant work, if any, as she actually performed it, or as generally required by employers in the national economy. If the claimant has past relevant work and is able to perform it, she is not disabled. If she cannot perform her past relevant work or has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors -- age, education, and work experience.

**ALJ's Assessment of Plaintiff's Mental RFC**

Plaintiff argues that due to the ongoing nature of her mental retardation, the absence of an opinion by a treating source as to Plaintiff's mental RFC does not reflect negatively on Plaintiff's credibility and the level of her impairment. Plaintiff further argues that the ALJ committed reversible error in basing his assessment of Plaintiff's mental RFC on Dr. McGee's short summary conclusion, firstly, because that conclusion constitutes a vocational, rather than a medical opinion, and secondly, because that conclusion is at odds with Dr. McGee's detailed function-by-function medical evaluation of Plaintiff's limitations, which the ALJ did not take into account.

It is true that the ALJ did not explain why he did not factor in the functional limitations noted by Dr. McGee. A review of the boxes Dr. McGee checked on the

13

October 21, 2005 Mental RFC Assessment form, as described above, however, shows inconsistencies, such that the ALJ was not required to adopt all of the limitations indicated on the form. More importantly, besides Dr. McGee's summary conclusion, the ALJ also relied upon Dr. Mades's evaluation of Plaintiff's mental/cognitive abilities, and that evaluation, unlike Dr. McGee's evaluation, was based upon an examination and testing, and fully supports the ALJ's determination that Plaintiff had the mental RFC for simple work with verbal directions.

In addition, the ALJ also pointed to the facts that Plaintiff did not stop working because she could not handle the demands of her job, that she received unemployment compensation, and that the record contained no professional opinion that Plaintiff could not work. These are valid factors for an ALJ to consider in assessing a claimant's RFC. Goff v. Barnhart, 421 F.3d 785, 792-93 (8th Cir. 2005) (finding it relevant that the plaintiff left work for reasons other than her medical condition; stating that plaintiff having worked with impairment and lack of evidence that condition deteriorated supported finding that she could perform that work); Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) (holding that it was not unreasonable for the ALJ to find that the plaintiff's alleged impairments were not as severe as he alleged where the plaintiff left his last job because the job ended); Johnson v. Chater, 108 F.3d 178, 180-81 (8th Cir. 1997) ("Applying for unemployment benefits may be some evidence, though not conclusive, to negate a claim of disability."); Bryant v. Astrue, No. 4:07CV00802 ERW, 2008 WL 3896024, at *9 (E.D. Mo. Aug. 18, 2008) (affirming denial of benefits where the plaintiff

was diagnosed with borderline intellectual functioning but was able to perform various jobs despite such impairment and there were no reports in the record from employers or vocational counselors indicating that she experienced difficulties with her jobs).

The Court notes that the Regional Center did not indicate a belief that Plaintiff's goal of being independent was impossible to achieve. The Court further notes that the Eighth Circuit has recognized that individuals with mild retardation can perform substantial gainful activity. See, e.g., Howard v. Massanari, 255 F.3d 577, 582-83 (8th Cir. 2001) (affirming ALJ's decision that claimant who had a full scale IQ score of 74 and was capable of performing simple tasks at a slow pace was not disabled); Cockerham v. Sullivan, 895 F.2d 492, 496 (8th Cir. 1990) (affirming ALJ's decision that claimant with a full scale IQ score of 71 and poor abilities in English, writing, and mathematics was not disabled where consulting psychologist concluded that he might be suited for unskilled entry level work). As such, the Court finds the ALJ's RFC Assessment is supported by the record.

**ALJ's Analysis of Plaintiff's Past Work**

Plaintiff further argues that the ALJ committed reversible error in failing to ascertain the requirements of Plaintiff's past work with regard to punctuality, attendance, adherence to a schedule, and the other functions in which Dr. McGee found marked limitations. Plaintiff is correct that in determining whether a claimant can perform her past relevant work, an ALJ must compare the limiting effects of the claimant's impairments with the demands of such work, and where there is no evidence of the

15

demands of the past relevant work, a conclusory statement that the claimant can perform past work does not constitute substantial evidence that the plaintiff is able to return to that work.  See Zeiler v. Barnhart, 384 F.3d 932, 936 (8th Cir. 2004) (citing Groeper v. Sullivan, 932 F.2d 1234, 1239 (8th Cir. 1991)); Kirby v. Sullivan, 923 F.2d 1323, 1327 (8th Cir. 1991).  An ALJ may, however, rely on a plaintiff's own description of her past duties in making these findings.  Zeiler, 384 F.3d at 936; Riley v. Apfel, 1999 WL 758662, at *1 (8th Cir. Sept. 22, 1999) (unpublished per curiam) (affirming Commissioner's finding that the plaintiff could perform his past work where the plaintiff's description in his vocational report of the demands of his previous position was consistent with the ALJ's RFC findings).  Furthermore, the record with regard to a plaintiff's past work need not be "developed in full detail," as long as there is evidence that the past work involved activities that the plaintiff could perform.  Battles v. Sullivan, 902 F.2d 657, 659 (8th Cir. 1990).

Here, the ALJ reviewed the requirements of Plaintiff's past work as a shipping and receiving clerk as set forth in Plaintiff's application forms.  The Court believes that this satisfied the ALJ's obligation on this matter.  As noted above, the ALJ was not required to accept the limitations found by Dr. McGee, and so those limitations were not relevant to the question of whether Plaintiff could return to the job where, as here, she had performed for over four years, and where there was no evidence that she had deteriorated since leaving that job for non-impairment related reasons.

16

## CONCLUSION

The Court believes that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 13th day of March, 2009.